1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    UNITES STATES OF AMERICA          )
                                       )
5                                      )
                                       )
6    vs.                               )  NO. 1:09-cr-10382-DPW-1
                                       )
7                                      )
     ALBERT GONZALEZ,                  )
8                                      )
                       Defendant.      )
9                                      )
                                       )
10

11

     BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
12

13

                        SENTENCING HEARING
14                       MOTION HEARING

15

16

17        John Joseph Moakley United States Courthouse
                       Courtroom No. 1
18                    One Courthouse Way
                      Boston, MA 02210
19                 Friday, March 26, 2010
                        2:38 p.m.
20

21

                 Brenda K. Hancock, RMR, CRR
22                 Official Court Reporter
          John Joseph Moakley United States Courthouse
23                    One Courthouse Way
                      Boston, MA 02210
24                    (617)439-3214

25

1   APPEARANCES:

2       UNITED STATES ATTORNEY'S OFFICE
        By:  STEPHEN P. HEYMANN, AUSA
3       1 COURTHOUSE WAY
        BOSTON, MA 02210
4       On behalf of the United States of America

5       MARTIN G. WEINBERG, PC
        By:  MARTIN G. WEINBERG, ESQ
6            KIMBERLY HOMAN, ESQ.
        20 PARK PLAZA, SUITE 1000
7       BOSTON, MA 02116
        On behalf of the Defendant.
8
        LAW OFFICES OF RENE PALOMINO, JR.
9       By: RENE PALOMINO, ESQ.
        46 NE 6TH STREET
10      MIAMI, FL 33132
        On behalf of the Defendant.
11
        K&L GATES LLP
12      By: MICHAEL D. RICCIUTI, ESQ.
        ONE LINCOLN STREET
13      STATE STREET FINANCIAL CENTER
        BOSTON, MA 02111
14      On behalf of Interested Party Company A

15      CLEMENTS & PINEAULT, LLP
        By: BEN T. CLEMENTS, ESQ.
16      24 FEDERAL STREET
        BOSTON, MA 02110
17      On behalf of Interested Party Company B

18

19  ALSO PRESENT:

20          U.S. PROBATION OFFICE
            JENNIFER D. SINCLAIR, SR. U.S. PROBATION OFFICER
21

22

23

24

25

1              (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     Friday, March 26, 2010):

7              THE CLERK:  All rise.

8     (The Honorable Court entered the courtroom at 2:38 p.m.)

9              THE CLERK:  This is the matter of the United States

10    versus Albert Gonzalez, Criminal Action 09-10382.

11             THE COURT:  Well, a couple of things.  Let me start to

12    be sure that I have got all the materials that the parties

13    wanted me to have.

14             I have the Presentence Report as revised on March

15    17th; I have the Probation Memorandum concerning the sentence

16    that was imposed by Judge Saris dated March 25th; I have two

17    packages of letters from Probation, one on March 22nd, one on

18    March 23rd; I have Mr. Gonzalez's Sentencing Memorandum; and I

19    have the Government's Sentencing Memorandum.

20             Are those the materials that I should have from the

21    parties on the merits here?

22             MR. HEYMANN:  Yes, your Honor.

23             THE COURT:  Now, there is a preliminary issue with

24    respect to the question of Company A and Company B being

25    entitled to some sort of protective order under the Victims'

1     Rights Act, and I want to be clear that I have this right.  I

2     am referring to paragraph 43 of the Presentence Report.

3          I will read it to be sure that I have the

4     circumstances correctly.  "Company A is a major national

5     retailer that processed credit card payments through its

6     computer networks.  On or about October 23rd, 2007, the group,

7     meaning the group of which Mr. Gonzalez was a part, victimized

8     Company A by initiating an SQL injection attack and placing

9     malware on Company A's network.  The evidence revealed that

10    Mr. Gonzalez and another breached Company A's computer network,

11    and that on November 6th, 2007 Mr. Gonzalez subsequently

12    transferred a file containing information taken from Company A

13    during the attack to the Ukrainian server."

14         There is a little bit more detail with respect to

15    Company A.

16         With respect to Company B, it is reported that

17    "Company B was a major national retailer which processed credit

18    and debit card payments through its computer network.  In or

19    about January 2008, Gonzalez and another breached the computer

20    systems of Company B through an SQL injection attack that

21    resulted in the placement of malware on its network.  Forensic

22    analysis reflects that Gonzalez was working with data stolen

23    from Company B less than three weeks prior to his arrest."

24         Now, I note that the defendant, in his version of the

25    offense, makes reference to the assertion that each of those

1    companies, Companies A and B, have represented that they

2    believe that any intrusions into their computer networks -- and

3    now I am reading from paragraph 85 -- into their computer

4    networks did not result in the taking of any customer data or

5    any risk of harm to their respective customers.

6         I want to be sure I am understanding what that means.

7         So, Mr. Heymann, I guess I want to understand, does

8    the Government take issue with the defendant's version here?

9    There does seem to be, at least it is not disputed, that there

10   was an intrusion.  It is disputed, apparently, that there was

11   the taking of customer data and then the question of risk of

12   harm as well.

13        MR. HEYMANN:  I think it's at that last step, your

14   Honor, that there is a dispute between the parties.  The

15   Government does not have independent evidence that any credit

16   or debit card number was exfiltrated, was taken from either

17   Company A or Company B --

18        THE COURT:  Well, what does it mean --

19        MR. HEYMANN:  -- but put at risk.

20        THE COURT:  -- in the Presentence Report to say that

21   Mr. Gonzalez subsequently transferred a file containing

22   information taken from Company A during the attack to the

23   Ukrainian server?

24        MR. HEYMANN:  I'm sorry.  I think I spoke overly

25   broadly.  The Government does not have any evidence,

1    independent evidence, that credit or debit card account

2    numbers, which was the object of the conspiracy, were taken out

3    of either Company A or Company B.  It does believe and does

4    contend that those companies were put at risk by the fact that

5    there were intrusions into those networks and, in fact, as the

6    Court has noted, files were taken out.

7              THE COURT:  But these are not track 2 files?

8              MR. HEYMANN:  These are not track 2 files.

9              THE COURT:  Mr. Weinberg, do you dispute any of that?

10             MR. WEINBERG:  I do not, your Honor.

11             THE COURT:  Okay.

12             Well, I do have, as I said, from Company A and Company

13   B, a request for a protective order under the Crime Victims'

14   Rights Act.  I do not know if counsel are present for Company A

15   or Company B here.

16             UNIDENTIFIED VOICE FROM AUDIENCE #1:  Your Honor,

17   counsel for Company A is here but does not wish to be heard

18   unless you --

19             THE COURT:  Okay.

20             UNIDENTIFIED VOICE FROM AUDIENCE #2:  Your Honor,

21   counsel for Company B, lead counsel, has stepped out, but I can

22   go grab Attorney Clements, if you need him.

23             THE COURT:  All right.  Well, let me frame it for you.

24   I am going to have to be persuaded that, in light of the

25   agreement that there was an intrusion and that some data was

1   taken, that I should continue a protective order.  It seems to

2   me that, under the circumstances, while they may not be a

3   victim in the sense of having been subject to loss, they

4   probably can be considered to be a victim for having been

5   exposed to an intrusion.  More than that, it seems to me that

6   the fact of the intrusion, which is not disputed by either of

7   the parties, should be made public as to each of those

8   companies.

9        So, in the absence of counsel -- I will take it up at

10  a later point -- but I just want you to understand where I am

11  going now, and you may want to reconsider whether or not you

12  have got anything to say, and when Mr. Clements comes back in

13  the room, you may want to consult with him about it, and we

14  will take up the question of whether or not I continue that.

15       But my view, I think, is that, unless persuaded

16  otherwise, that I am going to deny the motion for protective

17  order and seal, and that I will unseal the motions themselves

18  of the two companies and the Government's response, which were

19  previously sealed, and that I would list on the restitution the

20  precise names of Company A and Company B with "zero" as

21  restitution.

22       Now, one further point.  With respect to restitution,

23  we are really only talking about Hannaford, right?

24            MR. HEYMANN:  Heartland, your Honor.

25            THE COURT:  I mean Heartland.  Excuse me.

1          MR. HEYMANN:  Yes.

2          THE COURT:  But they are the only ones who have asked

3     for restitution.  But I think that I would list on the

4     restitution the victims and the question of restitution,

5     although I think that, with respect to the question of

6     restitution as to Heartland, that I also am going to not delay

7     trying to figure out exactly what it is before entering

8     judgment here but have a further hearing.

9          I think Judge Saris, as I understand it, at least from

10    the memorandum of Probation, that Judge Saris has put off the

11    question of precise restitution for some date in June.  Is that

12    right?

13         MR. HEYMANN:  She has, your Honor, and the questions

14    that underlie them, underlie the three cases, are common

15    questions, and Mr. Weinberg and I have not had a chance to

16    speak about the issue after the hearing yesterday.

17         THE COURT:  Right.  Well, I am simply going to put

18    that over.  I am not going to take time to deal with that issue

19    right now.

20         Now, let me understand, as well, the Government's

21    position with respect to role in the offense for this

22    particular case.  I recognize that I have got a joint

23    Presentence Report, effectively.  Mr. Weinberg seeks, I think,

24    a minor role.  I do not know what the Government seeks.

25         MR. HEYMANN:  Your Honor, the Government also objected

1    to the role enhancement in this case.  The Government believes,

2    and contends that Hacker 1, Hacker 2 and Albert Gonzalez were

3    all equals and should be treated as equals with no role

4    enhancement for Mr. Gonzalez in this case.

5            THE COURT:  In the case of Mr. Gonzalez as a

6    facilitator of the activities of Hacker 1 and Hacker 2?  Is

7    that, basically, it?

8            MR. HEYMANN:  Yes.  That, basically, it's that they

9    were each facilitating each other's activities.  Sometimes one

10   was scratching the other's back; sometimes it was vice-versa,

11   but that is activity among peers and not hierarchical activity.

12           THE COURT:  With respect to --

13           MR. HEYMANN:  With respect to the activity that the

14   Court is sentencing today.

15           THE COURT:  On the case before me.

16           MR. HEYMANN:  On the case before you.

17           THE COURT:  Now, with respect to that, is there any

18   evidence that Mr. Gonzalez received any financial benefit for

19   the activity before me today?

20           MR. HEYMANN:  No, your Honor.

21           THE COURT:  What was the nature of the *quid pro quo*,

22   if there was one; just friendship, association?  What?

23           MR. HEYMANN:  The nature of the *quid pro quo* was, on

24   occasion -- and let me take it in several steps here, if I may.

25   As I will argue to the Court later, these were three elite

1   hackers that were all in the business of stealing credit cards

2   and debit cards from different entities.  They talked all the

3   time.  When one of them ended up in trouble, they were sort of

4   befuddled by how to continue the attack, they would get advice

5   from the other.  When they needed to have, as in the case of

6   the servers, hacking platforms and secure places to store

7   malicious software and data, they would share it with each

8   other, they would produce it with each other.

9          So, they were not concerned on an individual,

10  case-by-case basis about moving money from one place to

11  another, because each were doing their own intrusions, each

12  were benefiting financially from those intrusions.  And in the

13  case of Mr. Gonzalez, what we know from yesterday, he had

14  $1.1 million in his backyard already.

15         THE COURT:  But is the thrust of what you are saying

16  that the cases parse the relationships in a way that means

17  that, if we focus simply on the activities that will give rise

18  to the conviction in this case, there will not be a specific

19  financial benefit to Mr. Gonzalez, but that Mr. Gonzalez,

20  through his relationship with others involved in this case,

21  obtained a financial benefit?

22         MR. HEYMANN:  That his goal in this or the opportunity

23  that was created by his relationship with these others was to

24  succeed at intrusions which would benefit him on some

25  occasions, just as he was helping them in intrusions that would

1    benefit them on other occasions.

2         THE COURT:  And only fortuitously it did not benefit

3    him in a financial way with respect to these?

4         MR. HEYMANN:  That is correct.  It is a snapshot in

5    time that led that not to happen.

6         THE COURT:  All right.  Well, I think my view -- well,

7    I should hear from you, Mr. Weinberg.  I am not sure that I see

8    this as a minor role or minimal role, but if you want to --

9         MR. WEINBERG:  Well, I think the problem is the

10   segregation of this case.  The principal criminal conduct in

11   this case involved Heartland, Hannaford's and 7-11.  As to

12   those activities, Mr. Gonzalez was simply a facilitator and no

13   more.  In other words, he was not involved in the computer

14   intrusions, in the hacking, in the injection.  That was

15   exclusively done by Hackers 1 and 2.  He did not receive,

16   whereas others did, the results of those intrusions.

17        In other words, there's claims by some or more of

18   those three entities that they had losses, that, in fact, there

19   was the exportation of credit and debit data.  It did not go to

20   him.  The Government knows that.  They've done an exhaustive

21   search of his servers and different of his other computers.

22        THE COURT:  But this is not true of Company A and

23   Company B.

24        MR. WEINBERG:  Company A and Company B, there was --

25        THE COURT:  There was no harm or loss, but there was

1    data that went to him.

2         MR. WEINBERG:  There was a small fraction of data that

3    was not the data that was the goal of the conspiracy, which is

4    credit and debit track 2 information.  None of that went to

5    him, and, as a result, none was sold by him.  The Government

6    has the computers of the person who received that kind of

7    information that was at the heart of the Judge Saris cases.

8         So, I think that if you focus on the criminal conduct

9    in this case, and the principal conduct, again, is the conduct

10   where these intrusions went farther than just the beginnings of

11   a breach, they went to the level of harm, and separated out

12   from the retail intrusions that Mr. Gonzalez participated in,

13   ten of them were before Judge Saris.  Company A and Company B

14   almost fall within that grouping.  It's the same kind of

15   activity, whereas the processer conduct and the Hannaford and

16   7-11, which is done almost exclusively by Hackers 1 and 2, as

17   to those, that criminal conduct, which I don't deny is

18   significant conduct, but I think it is at an eloquent

19   difference from the kind of conduct that made him a plus 4

20   yesterday, and I think that he is an appropriate person for a

21   minus 2, if not a minus 4.

22         THE COURT:  All right.

23         MR. HEYMANN:  Your Honor, I'm sorry.  If I may just

24   address one point there.

25         As you have heard, there is no dispute here that his

1   role here is very different than his role was in the TJX and

2   Dave & Buster's cases, for lack of a better shorthand.  But he

3   did take a far more principal role in two of the charged

4   victims here, Company A and Company B.  He happened to have a

5   lesser role in the other three.

6          But this was all part of a separate conspiracy.  It

7   involved different kinds of means, SQL injection attacks as

8   opposed to wireless attacks, and that's why the Government

9   contends that it all should be a neutral plane.

10         THE COURT:  Well, I guess my view on this, because I

11  do want to calculate the guidelines for this case directly, is

12  that I will not enhance his role in the offense here but take

13  out the enhancement that I guess is at paragraph 109, because I

14  do not find that in this case his role should be enhanced, as

15  it was, I gather, in the cases before Judge Saris.

16         Now, I see counsel for Companies A and B; lead counsel

17  for Companies A and B have come back in.

18         I think I mentioned to your colleagues my provisional

19  view, but before I act on that view, if there is something

20  further that you want to raise, I will be glad to hear from

21  you, Mr. Ricciuti and

22  Mr. Clements.

23         MR. RICCIUTI:  Michael Ricciuti, for Company A.

24         I'll be brief, your Honor.  I know you have seen our

25  memorandum.

1        Your Honor, I understand the Government's position in

2   this case.  I think Company's A position can be summarized very

3   briefly.  There's only one victim under the Statute 3771 with

4   respect to Company A's breach.  That's Company A and Company B,

5   for that matter.

6        There are no consumer victims.  There's no other

7   victim under the statute who has a statutory right to privacy

8   for which the Government has an obligation.

9        THE COURT:  Well, is there a privacy right for a

10  corporation?  Certainly not in Massachusetts and certainly not

11  in New Jersey.

12       MR. RICCIUTI:  As a victim, your Honor, there would

13  be.

14       THE COURT:  Well, you are saying that there is a

15  privacy right that inheres in the statute itself, but it does

16  not exist in Massachusetts.  There is no privacy right for a

17  corporation in Massachusetts who could not bring a right of

18  privacy action, nor I think could it in New Jersey.  I have not

19  spent time thinking about what happens in Plano, Texas.  But,

20  in any event, it would only be one of these -- I guess it is in

21  the air now -- personification of corporation kinds of

22  metaphors that lead us to this.

23       MR. RICCIUTI:  I'm not sure that's entirely accurate,

24  your Honor.  You are right to say that under state law and

25  federal law there would be no free-floating right of privacy

1   for corporations.

2          THE COURT:  Or even when ballasted by a statute, a

3   state statute.

4          MR. RICCIUTI:  That might be correct as well, your

5   Honor.  But if you look at two points that I think indicate

6   that here there is a privacy right.  First, that Congress

7   defined "victim" broadly enough to include a corporate victim.

8   There is no indication in the statute that Congress looked to

9   limit what a victim's right to privacy would be under the

10  statute.

11         THE COURT:  All right.  But if I deal with it there,

12  then it is a matter of discretion for me, right, whether or not

13  the victim is to be protected in some way or needs the

14  protection of the Court?

15         MR. RICCIUTI:  I don't believe so, your Honor.  I

16  think that the way that the statute is crafted, if you are a

17  victim under the statute, you have a right to privacy, and the

18  government has an obligation to protect it.  There's nothing to

19  indicate that Congress --

20         THE COURT:  Where do I find that?

21         MR. RICCIUTI:  That's 3771(e), your Honor.

22         THE COURT:  Well, that is the definition.

23         MR. RICCIUTI:  Yes, your Honor.

24         THE COURT:  Where is it that says that it is a

25  categorical right that the Court must observe?

1          MR. RICCIUTI:  Your Honor, that the right to privacy

2     would be 3771(a)(8).

3          THE COURT:  "The right to be" dealt with -- "treated

4     with fairness and with respect for the victim's dignity and

5     privacy."

6          MR. RICCIUTI:  Correct, your Honor.  And 3771(c)(1)

7     would be the Government's obligation to protect that right.

8          THE COURT:  Right.

9          MR. RICCIUTI:  There is nothing to indicate that

10    Congress --

11         THE COURT:  But that is not an obligation, is it, the

12    obligation in the sense that I am obligated to implement that

13    in some particular way, like with a protective order?

14         MR. RICCIUTI:  I think that's fair, your Honor, but I

15    think it does reflect Congressional intent to protect the

16    privacy of victims.  And as we have outlined in our papers, to

17    the extent that if there were damage to victims, damage to

18    consumers, there might be some state laws that would require

19    disclosure of that to the public.  Here, there isn't that.

20         THE COURT:  Why shouldn't consumers and shareholders

21    be aware that it is possible to penetrate the computer systems

22    of Companies A and B?

23         MR. RICCIUTI:  Your Honor, because, under these facts,

24    there is an unfairness here.  If this were brought today, if

25    this were a brand-new case, the hacking happened yesterday, I

1    would have a harder argument.  But what happened here is, the

2    hacking happened in 2007.  This case was begun in another

3    District, and that District decided, looking at these

4    principles, that the identity of these two companies shouldn't

5    be revealed.

6              THE COURT:  Well, but that is an agreement between an

7    arm of the Government and the defendant, which I am not

8    obligated to observe.  It seems to me I have different

9    responsibilities, among them those of transparency in

10   sentencing and also exposing in the course of the sentencing

11   what the extent of the crime was and those who were affected by

12   it if not in the form of harm.  What we have here is Company A

13   and Company B being at least vulnerable to SQL injection

14   attacks and successful ones.  Now, they just did not turn out

15   to be ones in which, apparently, some consumer funds were

16   taken.

17             MR. RICCIUTI:  But I'm not sure, your Honor, that that

18   distinction doesn't make any difference.  In the event that

19   there was some consumer data, we have another set of victims to

20   consider.  And the Court's quite right; when there are consumer

21   victims, there is another victim's right to balance against

22   this disclosure obligation.

23             Here, there's one victim; it's Company's A and B.

24   There's no indication that any data was stolen, and there's no

25   indication that this breach had any damage to anyone else.

1          Now that we are three years down the road and the

2     Government, for whatever reasons, took the position that

3     revealing the names of these two companies was unfair, Company

4     A and B are now in the position where they are in another

5     District under Rule 20 where they have to explain the

6     Government's reversal in its policy.  That's unfair to them.

7          THE COURT:  I should not say it is a matter of

8     indifference.  The Government in this District raises it.  I do

9     not think they are bound.  I do not think there is an estoppel.

10    But, in any event, ultimately it is my responsibility to deal

11    with this.  I find nothing unfair about that.

12         Company A and Company B can say, We have taken the

13    steps that are necessary to protect us from SQL injections in

14    the future.  There was no harm to any customer.  But it seems

15    to me that this awkward kind of insulation from transparency

16    for a corporation as opposed to, say, a human victim seems odd

17    to me in light of the fact that there is no privacy right.  I

18    do not read a privacy right in here for corporations generally,

19    to be perfectly candid.  Maybe that is what Congress meant, and

20    perhaps the Supreme Court will decide that if corporations can

21    have a right of speech, they can have a right of privacy, or

22    perhaps not.  But, in any event, I am not sure I am bound by

23    that either.

24         MR. RICCIUTI:  I don't disagree, your Honor, you are

25    not bound.  I guess what I am trying to point out is that the

1    Government took a position and in the case that was handled

2    before Judge Saris, as we read the record -- now, we could be

3    wrong -- but when the Government filed its first Rule 12.4

4    disclosure, it disclosed to the Government -- to the Court,

5    rather -- here are other corporate victims whose data wasn't

6    stolen who are not going to be publicly disclosed.

7         THE COURT:  Yes, but they were not identified in the

8    indictment.  Here they are identified in the indictment; they

9    are Company A and Company B.  It is one thing for the

10   Government not to pursue particularized claims.  It is one

11   thing for the Government not to make reference to loss of other

12   victims, although the Probation Office sometimes finds that.

13        But here we have got somebody right in the indictment,

14   two people right in the indictment, who managed successfully to

15   convince the United States Attorney in the District of New

16   Jersey and, apparently, the judge in the District of New Jersey

17   that, at least provisionally, there should be a protective

18   order.  I am not convinced.

19        MR. RICCIUTI:  I understand that, your Honor.  I

20   think, your Honor, that the strongest argument I can make in

21   response to that is, and it goes to back to Douglas Oil, there

22   is a notion that corporate victims in this atmosphere and with

23   a case like this need to be encouraged to come forward and work

24   with the Government.

25        THE COURT:  You mean to tell me that Company A and

1    Company B would not cooperate with the Government if faced with

2    something like this?  I cannot imagine that they would take

3    that as a corporate policy or even suggest that as a corporate

4    policy.  Of course they are going to cooperate.  There is no

5    incentive that is needed here.  There is, apparently, a benefit

6    that is available, at least for some people, in the District of

7    New Jersey, but it is not necessarily available here.

8         MR. RICCIUTI:  What I am saying, your Honor, is, I

9    don't reach the same conclusion, respectfully, as the Court

10   does.  I think if there is a notion that whenever you cooperate

11   with the Government you should expect that there is no

12   protection under 3771 for your identity, that is a huge

13   disincentive for corporations to cooperate.  They will go to

14   private sources to seal up their breaches and never disclose to

15   the Government and potentially leave consumers at risk.  That

16   is a very damaging policy.

17        THE COURT:  That may be so.  That is certainly

18   something the Government would have to consider.  But here I do

19   not think it was a matter of Company A and Company B coming

20   forward.  This was a matter of Company A and Company B being

21   identified as entities whose computer systems were breached.

22   So, we need not, I think, worry about how stouthearted

23   corporations are going to be about coming forward.  And the

24   government has to make that calculation all the time in dealing

25   with potential cooperators.

1          MR. RICCIUTI:  But I guess, your Honor, from the

2    Court's perspective, what I am concerned with is a policy that,

3    as a matter of flat rule, says there is no protection under the

4    statute for corporate victims.  If you come forward, or, better

5    yet, as the Court quite rightly puts it, if you, when the

6    Government does come a-calling, cooperate, if you don't put up

7    every defense you can think of to protect exactly this kind of

8    disclosure, you are running a risk.  That policy, if it's

9    written that large, is, at least in my mind, dangerous.  I

10   don't think it's what the statute says.

11         THE COURT:  It overstates it, I suppose, but I do have

12   some considerable difficulty shedding a tear for a corporation.

13         MR. RICCIUTI:  Your Honor, I hear what you're saying,

14   although I think the case would be markedly different if we

15   were starting fresh.  The fact that Company A and B were not

16   put on notice that back when this all started that this was a

17   likely result or even a possible result --

18         THE COURT:  So, they could have taken steps to avoid

19   and impede the Government's investigation?

20         MR. RICCIUTI:  No.  But they could have certainly

21   taken steps to make public disclosure on their own terms in

22   their own way so that, to the extent there was going to be any

23   public disclosure, they could at least alert the shareholding

24   public who might be alarmed and concerned that there is not

25   cause for alarm.

1          THE COURT:  They have had three years to alert their

2    shareholding public about problems with their security.  They

3    have chosen not to, relying, improvidently, on a protective

4    order.  But, frankly, I guess it is their choice, and they made

5    it.  Now it is my choice to deal with whether or not there

6    should be disclosure of such an entity, and I cannot say that I

7    have found this --

8          MR. RICCIUTI:  Understood, your Honor.

9          THE COURT:  -- compelling at this point.

10         MR. RICCIUTI:  I guess the last point I would make,

11   your Honor, and then I will cede to Mr. Clements, is that

12   ultimately those who will pay the price are the shareholders of

13   these corporations.  There's no victims, there's no consumer

14   who will at least rightly be concerned that there is some data

15   that has been stolen because there is no evidence there was

16   any.  But the shareholders, the pension plans, the folks that

17   own the stocks of these companies now will pay a price for the

18   company relying on the Government.

19         THE COURT:  What do you mean "pay a price"?  That the

20   stock will go down?

21         MR. RICCIUTI:  I think that's quite likely, your

22   Honor.  Companies A and B will be --

23         THE COURT:  I guess, then, it is the choices they made

24   about how transparent they were with their shareholders, with

25   the market, generally, about their exposure.  Other of these

1   entities made disclosure fairly promptly about it.

2   Corporations can make whatever choices they make, but

3   ultimately it is their responsibility, not improvident reliance

4   on a matter that is subject to reconsideration by a judicial

5   officer.

6           MR. RUCIUTTI:  I understand, your Honor.

7           THE COURT:  Okay.  Mr. Clements.

8           MR. CLEMENTS:  Thank you, your Honor.  Ben Clements,

9   for Company B.

10          I don't want to reiterate what Mr. Ricciuti has said.

11  Company B is largely in the same position as Company A.   I

12  would like to, if I could, however, your Honor, respond to some

13  of the interchange.

14          First of all, we are not here on a Constitutional

15  Citizens United Corporate Personhood argument, not in the

16  slightest.

17          THE COURT:  Well, but it is.  It is not

18  Constitutional, of course, it is not Citizens United, but it

19  does fall in this funny area of a corporation being a person

20  except when it is not.  It has got Fourth Amendment rights, but

21  it does not have Fifth Amendment rights or rights against

22  self-incrimination.  It does not have privacy rights, at least

23  among the jurisdictions with which I am familiar.  I do not

24  think there is any jurisdiction in which there is privacy

25  rights to a corporation.  So, we deal with this kind of, to use

1    an anthropomorphic metaphor, hermaphrodite of a business

2    organization.  That is what it is.  And the question is, does

3    it make any sense, under these circumstances, to keep from

4    disclosure the identity of a corporation which has had its

5    information technology systems breached, another way of saying

6    that they were vulnerable to breach?  And I do not understand

7    why one should do that.  I can think of -- well, I cannot think

8    of -- but it is only a testament to my lack of imagination that

9    I cannot think of occasions in which perhaps corporations could

10   be subject to some sort of privacy in particular kinds of

11   settings that may involve individuals within the corporation,

12   but I do not see it here.

13          MR. CLEMENTS:  Well, your Honor, the point I was

14   making is, the reason that Company A and Company B have even

15   been identified to the Court by the Government in

16   Massachusetts, not in New Jersey, but by the U.S. Attorney's

17   Office in Massachusetts, is because the Government recognizes

18   that, under the local rule, the corporations are victims, that

19   they are required to identify --

20          THE COURT:  No.  It is because they are indicted.  It

21   may be that as well, but they are also indicted.  They are

22   identified in the indictment itself.  Whether under any

23   circumstances I would accept an indictment like this myself,

24   taking the first cut at it, I do not know why I should accept

25   it here.  Some corporations get special privileges; they get

1    not to be identified.

2         MR. CLEMENTS:  Right.  Your Honor, the whole issue

3    of -- you referred to the company's decisions.  The company's

4    decisions were not made in a vacuum.  The company's decisions

5    were made in light of existing statutory obligations and

6    existing understandings reached with the Justice Department.

7    The statutory obligations that apply here in Massachusetts and

8    that apply in the jurisdiction in which my client is located

9    clearly define when a company is obligated to make disclosures

10   about a breach of its security.

11        THE COURT:  It is not prohibited from making

12   disclosure about breach of security, and if the company is

13   concerned about that, then they have to think about it.

14        The short answer, I think, to this, or to that aspect

15   of the argument, is that companies are about risk and return

16   and evaluation of risk.  They make their choices.  They make

17   their choices in the face of uncertainty.  There is nothing

18   certain about a protective order under these circumstances.

19   So, I guess I cannot say that there has been some breach of a

20   reliance interest that is enduring and not capable of

21   modification.

22        MR. CLEMENTS:  Well, I would respectfully argue, your

23   Honor, there is a reliance issue.  And I would point out that

24   the U.S. Attorney here in Massachusetts has said in its papers

25   that, had the company relied on the representations that were

1   made in New Jersey, then they would agree that the company's

2   expectation that the privacy would be maintained should apply.

3           THE COURT:  Well, that makes two of you, then.  But

4   there is a third; that is the Court.  It is a little bit like

5   Lincoln's Cabinet.  When they took votes, Lincoln would ask,

6   and the vote would come back five to one, with Lincoln being

7   the one.  And he would say, "Five to one.  The ones have it."

8           MR. CLEMENTS:  I fully understand --

9           THE COURT:  The U.S. Attorney makes a decision; that

10  is fine.  But they do not decide what the sentence is going to

11  be, they do not decide what transparency is going to be

12  afforded to papers that are filed in the Court.  That

13  ultimately is the Court's responsibility.  And while it may not

14  be in the Department of Justice's best interest over the long

15  run to create such uncertainty, I am not sure that I should

16  factor that into my analysis of whether or not it should be

17  publicly available.

18          MR. CLEMENTS:  Well, your Honor, it's not something

19  that is included in the indictment.  The indictment lists

20  Company A and B only by those references, "Company A" and "B."

21  Where the Government made representations and the companies

22  relied on them -- and if I could just take one minute to

23  explain what I think is the meaningful and detrimental

24  reliance.

25          THE COURT:  Sure.

1     MR. CLEMENTS:  It is not a question of they wouldn't

2  have cooperated in the absence of that assurance.  It is a

3  question of at the time when the company was making the

4  decisions, how do we handle this?  Do we need to make a

5  disclosure, should we make the disclosure?  Number one, is

6  there a statutory obligation for us to make a disclosure?  No,

7  there is not.  The reason there is not is because no customer

8  information was taken.  There may have been access to their

9  systems, but nothing was taken, and, so, there's no obligation

10 to disclose.

11    THE COURT:  Well, just so I am clear, when you are

12 talking about "statutory obligation," you are talking about

13 duties to disclose under securities laws?

14    MR. CLEMENTS:  Under state laws dealing with

15 compromise of personal information, under Massachusetts,

16 basically, the identity theft law.

17    THE COURT:  Things for which they could be either

18 indicted or the subject of some sort of civil proceeding?

19    MR. CLEMENTS:  You mean, if they were not in

20 compliance?

21    THE COURT:  If they fail to disclose; they say, We do

22 not have to disclose, we do not have to disclose for purposes

23 of securities law, we do not have to disclose for purposes of

24 privacy-compromise law.

25    MR. CLEMENTS:  I don't believe indictment, but, yes;

1   civil liability if they fail to comply.

2          THE COURT:  Well, there could be indictment for

3   purposes of securities fraud.  If there were a material event,

4   it could be.

5          MR. CLEMENTS:  Right.

6          THE COURT:  But putting that to one side, what that

7   means is they were under no obligation to make disclosure

8   generally to the public.  That is their calculation.  It is not

9   the calculation of what happens when matters are brought to the

10  attention of the Court on which the Court is obligated to

11  sentence.

12         I started this -- and I guess, perhaps, you were not

13  in the room -- but I started this by making sure that I had

14  here in the Presentence Report an agreement -- as reflected in

15  the Presentence Report -- an agreement that their information

16  technology systems have been compromised in the sense they have

17  been breached by the defendant and his associates.

18         So, that is what we have here.  Those are the facts.

19  It is not just saying they had in their mind Company A and

20  Company B, which would be a different case.  This is a case in

21  which they took affirmative actions that are the subject of

22  relevant conduct for me in making a sentence.  It seems to me I

23  have an obligation to, unless there is some real, identifiable

24  interest to the contrary, a rape victim, to indicate what it is

25  that I am relying upon in making my decision.  And I do not

1    rely upon unidentified and unnamed victims, which is what your

2    client is or purports to be and comes to me as a victim, as a

3    basis for sentencing.

4         It is much more fundamental than that.  It really

5    comes down to the question of, if they are going to evaluate

6    whether or not a judge has acted properly or improperly, you

7    have to know what the judge is acting on.  That has to be

8    transparent, in the absence of some very specific kind of

9    compromise of an identifiable cognizable privacy right.

10        MR. CLEMENTS:  Well, the identifiable right that I

11   would point to is, having first made the determination no

12   statutory obligation to disclose, they then consult with the

13   Justice Department that is handling the case.  There is an

14   agreement with the Justice Department that the company's

15   identity will not be disclosed, and it is at that point that

16   the company detrimentally relies, because if there was any

17   expectation that there would be a need for or requirement that

18   the identity would be disclosed, the company could have made

19   the disclosure at that time, rather than being in a situation

20   where it could appear to be some sort of foot-dragging, belated

21   disclosure.

22        And if I could, respectfully, your Honor, with respect

23   to the issue of what the Court has relied on for the decision,

24   as I understand it -- and I'm not party, obviously, to the

25   dispute between the United States and the defendant here --

1    but, as I understand it, the involvement of the defendant with

2    respect to Company A and Company B makes absolutely no

3    difference, at least to the Guidelines.

4         Now, I understand the Court, of course, is entitled

5    and obligated to consider all relevant information, but it

6    seems that the involvement of Company A and B as two additional

7    companies whose systems were penetrated but did not in any way

8    impact the conduct that was carried out from there, it seems

9    that the difference that that could make in the overall

10   sentence, given the breadth of the involvement with respect to

11   companies whose information was, in fact, compromised, is so

12   slight that it seems that there is not a real risk that there

13   is a sort of lack of transparency about the sentence if the

14   companies' identities remain confidential as were promised to

15   them by the Justice Department.

16        THE COURT:  Well, I guess there are several levels of

17   response.  One, is that it is recited in the Presentence

18   Report.  Number two, it seems to me it is the responsibility of

19   the Court to create the record.

20        People can decide whether or not it was slight or

21   material or insignificant or whatever, but the treatment of

22   victims and the way in which victims are identified in the

23   charging document and in the Presentence Report is a matter

24   that is material, and, in fact, it provides the foundation for

25   Company A and Company B to come here and ask for a protective

1    order.

2         You say you are victims.  Mr. Ricciuti tells me that

3    you fall within the definition of 3771, which reads, "For

4    purposes of this chapter, the term "crime victim" means a

5    person directly and proximately harmed as a result of the

6    commission of a federal offense."

7         Okay.  If you are a victim, you are properly within

8    the scope of the Court's evaluation.  The Court should be

9    sensitive to real rights of privacy, using that as the generic

10   here.  I suppose the Department of Justice should be concerned

11   with being able to offer reliable reliance interests, but that

12   is not my responsibility.  My responsibility is to have a

13   transparent sentencing.

14        So, unless there is something new here, I think we

15   have exhausted this issue.

16        MR. CLEMENTS:  Thank you, your Honor.

17        THE COURT:  Okay.  As I indicated, I will unseal the

18   applications for the protective order by Company A and Company

19   B and also the Government's response.  And in so far as

20   documents of this Court are concerned, the Judgment of

21   Conviction will reflect the names of the identified victims and

22   illustrate that only one of those victims, Heartland, has

23   sought restitution, which is consistent with the positions of

24   Company A and Company B that they have had no harm done to them

25   here, harm in the sense of loss.

1            But it seems to me that the exposure of a corporation

2    to compromise of its information systems technology is not

3    insignificant; in fact, it is the foundation for alleged

4    victimization here, and I believe that Company A and Company B

5    should be identified.  I have perhaps spent too much time on

6    this, making more of it than I should, should in terms of the

7    argument that both Mr. Ricciuti and Mr. Clements made, which

8    is, in terms of larger significance, it is not the most

9    significant element or one of the modestly significant

10   elements, but it is an element here.

11           The final point I would make is that there is no

12   privacy interest for corporations.  There should not be a

13   privacy interest for corporations.  Corporations are these

14   legal congeries.  And at the risk of having gone on too long,

15   one of the things that came to ming, as I thought about this,

16   is a speech that the Poet Archibald MacLeish gave to I think it

17   was the 100th Anniversary of the *Harvard Law Review*.  MacLeish

18   had been a partner at Choate, Hall & Stewart before he left to

19   go to Paris and start his writing career.

20           But he recites in that speech, reflecting on his law

21   school career -- talked about the legal conception of the

22   corporate entity, the enchanting fiction that a corporation has

23   an existence of its own distinct from the existence of its

24   employees, its officers and even its owners.  It was striking

25   to him, and he says that when he first met that lovely whimsy

1    in the law school, he embraced it as though it were mine.

2          And then he quotes a poem that he drafted at that

3    time.  I will not read the entire poem, except the last two

4    lines.  "The Oklahoma Ligno and Lithograph Company weeps at a

5    nude by Michael Angelo."

6          It is so absurd to suggest that there is this

7    anthropomorphic quality to corporations and that they are

8    entitled to some special benefits as to leave it open to spoof

9    by poets.

10          So, the short of it is, I am not going to acknowledge

11   in this context the right to privacy on which a protective

12   order would be appropriate.  And the parties, if they choose

13   to, are free to refer to the actual name of Company A and

14   Company B in the course of their arguments here.

15          So, now, turning back to the question of calculation

16   here of the Guidelines, I understand your position,

17   Mr. Weinberg, that the building block of loss, which drives

18   this thing, is wooden and perhaps not based in any kind of

19   empirical evaluation; it is simply a ready-made structure to

20   construct this sentence.  But that is what the Sentencing

21   Commission did, and while I am not bound to follow the

22   Sentencing Commission in the application, I do have to ensure

23   that I have calculated the Guidelines accurately here.

24          So, is there anything else about the calculation of

25   the Guidelines that you would like me to consider?

1          MR. WEINBERG:  Well, I don't want to burden the Court

2     even if I win --

3          THE COURT:  You are the only lawyer in America who

4     does not want to do that.

5                         (Laughter)

6          MR. WEINBERG:  I want to burden the Court under 3553

7     and try to achieve for Mr. Gonzalez a certain sentence --

8          THE COURT:  Right.

9          MR. WEINBERG:  -- and not win Pyrrhic victories on

10    guideline calculations that will, nevertheless, end up above a

11    Level 43 and --

12         THE COURT:  Well, I think I understand that; that is

13    to say, I think Judge Saris, at least reading this synopsis of

14    what she did, had the same view, which is, it does not make any

15    difference, really, here, as a practical matter.  It might if I

16    said, No, it is really every card constitutes 50 cents; I

17    suppose that might change it.  But it is an artificial

18    construct that was developed as a way of creating these

19    Guidelines.  But we are dealing here with a guideline that is

20    capped; it is no higher than and no lower than 35 years, 240

21    months.

22         Are there any other changes or corrections that you

23    would have me consider in the Presentence Report?

24         MR. WEINBERG:  For instance, because of the Probation

25    Department's decision, and Ms. Sinclair has done yeoman's work

1    in this very difficult case --

2            THE COURT:  Right.

3            MR. WEINBERG:  -- there is at least one factual

4    statement that I would like to have redacted, and that is on

5    footnote 3, page 6, that says, in essence, that the evidence

6    reveals that Gonzalez and Hackers 1 and 2 gained access to over

7    100 pieces of credit and debit card and track 2 data that was

8    being processed by Heartland, and it is the corollary of my

9    earlier representations to the Court that I believe Mr. Heymann

10   has not contested that there simply was not any track 2 data,

11   any debit data, any credit data, that was available to

12   Mr. Gonzalez.

13           THE COURT:  So, does it then mean that I strike

14   Gonzalez's name?

15           MR. WEINBERG:  Yes, your Honor.

16           THE COURT:  Mr. Heymann?

17           MR. HEYMANN:  Your Honor, the forensic evidence is

18   that the cards at Heartland payment systems -- that the access

19   to the account numbers was gained after the date of the

20   defendant's arrest, and, therefore, he would not be -- we have

21   no evidence whatsoever -- it may have occurred, but we have no

22   forensic evidence that he, himself, had access to those

23   hundred-million cards, and, therefore, we have no objection to

24   it being stricken.

25           THE COURT:  All right.  So, we will strike

1    Mr. Gonzalez's name from that footnote.

2         MR. WEINBERG:  Okay.  I just wanted to preserve my

3    argument that the loss significantly overstates in this case,

4    where he received no profit, accessed no debit or credit cards

5    from the hacking of Hacker 1 and 2, that it is even a more

6    extreme example of how the $500 per card or the loss

7    calculations or intended loss calculations are not

8    correspondent to his particular offense conduct in this

9    particular case as contrasted to yesterday's case.

10        THE COURT:  All right.  Thank you.  Let me frame the

11   discussion a bit, and the way in which I would like to proceed

12   is to hear from the Government, from Mr. Weinberg, any victims

13   who wish to be heard on the matter and then, of course, from

14   Mr. Gonzalez.

15        But I have two propositions that I want to consider or

16   want the parties to address themselves to.  One, as I said, the

17   Guidelines calculated -- and I think I agree with Mr. Weinberg,

18   in a wooden way it is a way to get to figures, but the use of

19   caps at 43 is an indication that at a certain point you are

20   just creating telephone numbers, not something meaningful.  But

21   the Guidelines themselves are 35 years.  That is the sentence

22   that would be imposed for the relevant conduct here.

23        Second, that Judge Saris has already imposed judgment

24   with respect to aspects of the relevant conduct, although I

25   understand that the Government has preserved, and the

1    defendant has preserved, the idea that she was not considering

2    the relevant conduct in this case directly.

3         Nevertheless, I have to say that I find Judge Saris's

4    sentences on their face to be reasonable, and I want to

5    understand what additional delta there is that would cause me

6    to go higher than her sentence or reasons to go lower than her

7    sentence in one of those other cases.  It is an awkward aspect

8    of this case that -- or these cases -- that we have a very firm

9    rule with respect to random draw of criminal cases with a

10   purpose of avoiding the potential for judge shopping.

11        That having been said, it creates a certain

12   awkwardness of having two judges deal with a bundle of relevant

13   conduct, as Judge Saris and I have had to do here.  And I would

14   add one further thing; that she and I have not discussed the

15   merits, the substance of sentencing, in any way.  I became

16   aware of what happened in her court and what she decided to do

17   by means of the memorandum from the Probation Office.  We

18   discussed procedural issues, but not the substance of it, to

19   try to preserve that local rule.  This may be an occasion or a

20   precipitant for changing that local rule.  I am sure you have a

21   modest interest in that but not right now.

22        So, with those kinds of touchstones, Mr. Heymann, what

23   is the Government's recommendation, and how does it play into

24   those choices?

25        I understand the parties have agreed that they are

1    going to keep it within a range that goes no higher than 25

2    years, which is 10 years lower than the guideline in this case,

3    and, as I said, it seems to me to be not unreasonable, but now

4    I am going to have to do it in a more specific way.

5          So, what is the Government's position?

6          MR. HEYMANN:  Your Honor, let me start, if I may, with

7    the Government's recommendation.

8          THE COURT:  Sure.

9          MR. HEYMANN:  The Court should sentence Albert

10   Gonzalez to a sentence of 23 years' imprisonment, to be

11   followed by an additional period of two years, pursuant to

12   18 U.S.C. Section 3147.  The Government has previously argued

13   in its briefing to the Court that it should be 25 years, but I

14   wanted to clearly break out what I think is two separate things

15   that are now before the Court.

16         THE COURT:  Just so I am clear about that, because it

17   is not altogether clear -- although I understand Ms. Sinclair's

18   position on this -- that is how Judge Saris fashioned her

19   sentences; is that right?  That is to say, the additional two

20   years was tacked consecutively on top of the substantive claim?

21         MR. HEYMANN:  Well, the 3147 was not before Judge

22   Saris.

23         THE COURT:  There was no --

24         MR. HEYMANN:  There was no 3147 filing.  What the two

25   years was was the Aggravated Identity Theft.  So, she created a

1    20-year sentence that was 18 years for all the counts that

2    weren't Aggravated Identify Theft and then two years there.

3    So, what Probation has clearly put out to us is that a 3147 can

4    be imposed on and after that, but it does not require that the

5    1028A be on and after the Court's sentence here.

6         THE COURT:   Okay.

7         MR. HEYMANN:   I don't think I need to rehearse -- I'm

8    not even sure it would be valuable to rehearse right here that

9    the defendant was -- the details of the -- a lot of the details

10   of the defendant's criminal wave.  He was at the center of the

11   largest, most costly series of identity thefts and computer

12   intrusions in the history of prosecution.

13        But, yesterday Judge Saris sentenced the defendant

14   with respect to one part of it, and there are two additional

15   parts that are separate and distinct that are before this Court

16   right now for consideration.

17        Judge Saris carefully cabined her analysis and

18   sentencing to what I will loosely and generally refer to as the

19   TJX and Dave & Buster's portions; the TJX case referring, as we

20   have during the course of our colloquy here, to that whole body

21   of wireless attacks on retail networks that stole a lot of

22   credit cards with his organization, the Dave & Buster's case

23   being a variant of that going at a restaurateur; it wasn't

24   wireless but a variant of that going at a restaurateur.

25        Before this Court is two separate things, two separate

1    matters that have not been vindicated.  One is, there is a

2    totally separate conspiracy that goes on with Hacker 1 and

3    Hacker 2, and we began this proceeding with a discussion of how

4    that conspiracy was very different than the hierarchical

5    corporation that he built to do the wireless attacks that Judge

6    Saris sentenced.  And it also has a different structure; it has

7    a totally different set of techniques.  It's using these SQL

8    injection attacks, internet attacks to do it.  And it has a

9    totally different set of victims.  So, there is a separate

10   criminal activity and a separate victim body to be vindicated.

11        Then, there is on top of that, and not before Judge

12   Saris, because there was no notice filed and it wasn't brought

13   up in the Presentence Report, is the vindication of the Federal

14   Court itself; that he was on pretrial release.  Candidly, he

15   was on pretrial release for the entire wave of his criminal

16   activity, but before this Court is a segment that goes from

17   2006 to 2008, when he is on pretrial release and commits the

18   crimes here.

19        THE COURT:  Let me just be sure I understand, because

20   it is a complex background.  He is on pretrial release from the

21   District of New Jersey.  There is, I gather, a supervised

22   release violation warrant outstanding, or I do not know where

23   it stands at this point.

24        MR. HEYMANN:  I don't believe it's outstanding

25   anymore.

1          THE COURT:  Let me just be sure I understand this.

2     With respect to all of the cases, this is activity committed

3     while he is on pretrial release, isn't it?

4          MR. HEYMANN:  Yes, your Honor.

5          THE COURT:  So, just that this has an origin in the

6     District of New Jersey does not distinguish this from the other

7     cases.

8          MR. HEYMANN:  That's correct, your Honor.  I mean, the

9     short and candid history is, to take the critical building

10    blocks, I think, he gets charged in I believe it's June, it may

11    have been July, of 2003, with Access Device Fraud 18 U.S.C.

12    Section 1029.  He is released on pretrial release while he is

13    cooperating in the investigation of crimes with Secret Service.

14    During that period -- that ends sometime in 2007, but during

15    that period he's committing the crimes that are first charged

16    in the cases before Judge Saris and then the cases that are

17    before you.

18          I was, as the prosecutor, unfamiliar with 3147, did

19    not -- was unfamiliar with it until the charges are, in fact,

20    brought in the District of New Jersey with the necessary notice

21    having been provided, and it having been done in the New Jersey

22    case, there was no reason to duplicate it in the Massachusetts

23    case and in the New York case.  So, they do not end up part of

24    the New York and Massachusetts case, and they end up part of

25    the New Jersey case.

1          So, that's the mechanics of what happens.

2          THE COURT:  Right, but this is also for my general

3     self-improvement.  In this District the United States

4     Attorney's Office has not used 3147 as a mechanism for

5     charging?

6          MR. HEYMANN:  I don't know the answer to that.  I

7     simply was unaware of the statute.  It does not mean that there

8     aren't --

9          THE COURT:  I cannot recall.

10         Ms. Sinclair, do you know if there are 3147 charges?

11         PROBATION OFFICER SINCLAIR:  I have seen it used

12    before, your Honor.  I am not sure it has been done as an

13    actual charge of conviction or just as a notice, but I have

14    seen it applied in the Guidelines and run consecutively on a

15    handful of occasions.

16         THE COURT:  In cases brought in this District?

17         PROBATION OFFICER SINCLAIR:  Yes, your Honor.

18         THE COURT:  But with a 3147 notice?

19         PROBATION OFFICER SINCLAIR:  With notice, yes.

20         MR. HEYMANN:  Okay.  So, to answer the Court's, I

21    think, first question, what is before this Court that was

22    different, distinct, un-vindicated, unaddressed, in the earlier

23    proceedings are those two things, a separate body of criminal

24    activity and with a separate set of victims and a separate set

25    of mechanisms, and then the 3147 action of being -- that, in

1    turn, has a separate reason to vindicate it and a separate

2    reason to address it, which is why it is broken down in the

3    Government's recommendation.

4         THE COURT:  Well, it is more than a separate reason.

5    It is mechanical, effectively.

6         MR. HEYMANN:  Yes.

7         THE COURT:  The question, I guess, for me is whether

8    it has been internalized in the gestalt of Judge Saris's

9    sentence already.

10        MR. HEYMANN:  I cannot speak for Judge Saris.

11        THE COURT:  Was there reference made to it or the fact

12   that he was on supervised release at the time that the offenses

13   in the two Judge Saris cases were handed down?  The second

14   issue is, she got the same Presentence Report?

15        MR. HEYMANN:  Yeah.  She had the same -- and she had a

16   different Presentence Report, but she did have the same brief

17   which the Government filed in all three cases --

18        THE COURT:  Right.

19        MR. HEYMANN:  -- and which did make reference to it.

20   What I don't know is whether, as she did her analysis, she --

21        THE COURT:  At least, she did not discuss it during

22   the course of her recitation of reasons or in the argument?

23        MR. HEYMANN:  As I recall, she referred at one point

24   to the defendant -- and I don't intend to be making argument in

25   saying this; I am trying to recall the event --

 1          THE COURT:  Right.

 2          MR. HEYMANN:  -- as having been like a double agent of

 3   some form.  But I do not recall any discussion beyond that --

 4          THE COURT:  And the double agency arising out of

 5   cooperation following his initial arrest in 2003?

 6          MR. HEYMANN:  Yes, and committing the crime while

 7   cooperating.

 8          PROBATION OFFICER SINCLAIR:  Your Honor, may I have a

 9   moment --

10          THE COURT:  Yes.

11          PROBATION OFFICER SINCLAIR:  -- just to let you know

12   that that enhancement was not applied in Judge Saris's case.

13          THE COURT:  I know it was not formally.  What I guess

14   I am saying is that Judge Saris had before her, I believe, the

15   same guideline, 35 years, right?

16          PROBATION OFFICER SINCLAIR:  She did not, actually.

17          THE COURT:  What was her guideline?

18          PROBATION OFFICER SINCLAIR:  Hers was slightly

19   different because she had a higher statutory maximum on the

20   counts of conviction.

21          THE COURT:  So, it was uncapped -- or not uncapped --

22   but the cap was raised?

23          PROBATION OFFICER SINCLAIR:  There was no actual --

24   the guideline would have been life, but there was no actual

25   charge that carried life, so the guideline was 207 years, just

1    because it wasn't -- it couldn't become life.

2            But the enhancement for the 3147 was not applied in

3    Judge Saris's case because it was not giving notice in Judge

4    Saris's case.

5            THE COURT:  Right.  That is a formal issue, I think --

6            PROBATION OFFICER SINCLAIR:  Right.

7            THE COURT:  -- because, for the most part, I think

8    judges generally take into consideration -- not that they are

9    obliged to apply it like an 851 -- but they take into

10   consideration whether or not the defendant is on supervised

11   release or subject to some lingering aspect of a prior sentence

12   before they do this.

13           So, I guess what I am getting at is, as a formal

14   matter, both you and Ms. Sinclair are right, that if it is not

15   3147, as an informal matter, I cannot imagine that it was not

16   part of the consideration.

17           MR. HEYMANN:  Again, I can't speak to it because it

18   wasn't articulated.

19           THE COURT:  Right.

20           MR. HEYMANN:  All I know is what was before her, and,

21   as I indicated, that same brief was before her that raised the

22   fact.  The fact was in the brief.

23           Okay.  But the second part, then, in a sense to go

24   backwards, is, what is different or what is important about

25   this separate kind of activity.

1          THE COURT:  I think maybe the question is that, but it

2     is a little bit broader than that.  It is, what is it that

3     makes this require something more by way of sentence?  One can

4     take, I suppose, a geometric approach to sentencing, as aspects

5     of the Guidelines do, or arithmetic, saying, if one crime is

6     bad, then two crimes are twice as bad, and three crimes are

7     three times as bad.  But that is not what the Guidelines do,

8     and it is not what anybody with common sense would do.

9          So, the question is, what is the delta here?  Why is

10    there a delta?  Why should I go higher, why should I go lower,

11    in light of the larger set of issues that we always have when

12    we are dealing with multiple charges and grouping and

13    overlapping here overlapping indictments by different

14    jurisdictions?

15          MR. HEYMANN:  The delta here, your Honor, I think is

16    twofold, and it has to do with the nature of the evolution of

17    the criminal activity.  The first is that there is a delta

18    associated with moving from attacking individual stores to

19    attacking payment processors, to moving from -- To put it in

20    its most simple form, if a customer hears that their card is

21    vulnerable at a particular store, they can simply decide

22    whether they are going to shop there or someplace else.  But

23    when it goes at the system itself, when it attacks the system

24    itself, where you can't differentiate in some sense where you

25    are going to shop, it acts like a tremor; you can't move

1    anyplace because there is nothing -- it is fundamental to --

2          THE COURT:  When you say "attacks the system," you

3    mean a consolidator like Heartland --

4          MR. HEYMANN:  Yes.

5          THE COURT:  -- which does multiple companies as

6    opposed to drive-by hackings through wireless methods?

7          MR. HEYMANN:  Exactly.  So, that's number one.

8          Number two is that it also reflects the evolution of

9    computer crime itself that in a way is frightening and

10   dangerous and needs to be addressed separately.

11         You can see it -- just to take, again, the defendant

12   as the model, in 2003 he goes up to an ATM, he's gotten some

13   card numbers, he starts taking the money out.  In the next step

14   he's become -- there is an organization.  It's an American

15   organization.  He's the company CEO and COO.  He's all the O's

16   and C's up there, running the organization, but it's a

17   structured organization.

18         In the last step, which is where crime has moved and

19   it is much more dangerous and needs to be addressed separately,

20   you have elite international carders and hackers moving

21   seamlessly across international borders, sharing attack tools,

22   helping each other to build the attacks, providing each other

23   assistance.  And they are not worried about honor among

24   thieves.  They are not worried about honor among thieves,

25   because, number one, as we discussed, I guess, in the beginning

1    of this proceeding, sometimes one of them is going to benefit,

2    sometimes another one is going to benefit.  They are also not

3    worried about honor among thieves, because what they are using

4    as a basis of communication is a nickname that is often nearly

5    untraceable, the cover of the anonymity of the internet.

6         So, the crime itself, of which he has participated and

7    moved actively, has moved from a simpler model, one that was

8    addressed before, to this more dangerous, more rich, more fluid

9    model that is, in fact, becoming the model for large-scale

10   internet crime and needs to be addressed separately as being

11   unacceptable and we are going to stop it.  Those are the two.

12        THE COURT:  But let me just see if I can unbundle that

13   a bit.

14        The international quality of this was evident as well,

15   was it not, in Judge Saris's case, and, in fact, the sentence

16   that Judge Wolf imposed?

17        MR. HEYMANN:  Yes, but in a much simpler form, as it

18   were.  The gravamen of those offenses were things that were

19   going on in America.  Humza Zaman before Judge Wolf; yes, the

20   money was money that had started over in Latvia, but the

21   gravamen of the offense was Humza Zaman flying out to San

22   Francisco, picking up cash from somebody with an Eastern

23   European accent or voice and shipping it back to Gonzalez.

24   It's almost a classic money courier or money shipper event.

25        With respect to the matters before Judge Saris, if you

1    looked at where the weight of the activity was, 85 percent of

2    the activity, it's going on in cars and apartments, where

3    there's wireless attacks going on at the businesses.  It's

4    going on in the United States.  He's having to go outside to

5    get, for example, Office Max's cards decrypted; he did not have

6    the capacity within the United States to do it.  He used his

7    network of friends to find somebody who could decrypt those

8    cards outside of the country.

9         So, there is, by all means, international activity

10   going on there, and it is, by all means, important, but it's

11   not at the core of the offense in the way that it moves to the

12   core -- it's not the way it moves to the core here or it

13   becomes much more fluid here.

14        THE COURT:  Let me ask about the internet dimension of

15   that.  How is it different in kind as opposed to degree?  I

16   understand you are characterizing the Judge Saris cases as

17   wireless incursions, and this is a more fundamental incursion

18   in a system of -- for lack of a better word, as a financial

19   intermediary for these kinds of credit cards.  But is it any

20   different, really, in terms of using the internet?

21        MR. HEYMANN:  The activities in the cases before Judge

22   Saris not exclusively but predominantly relied on physical

23   presence.  Not only did they rely on physical presence for the

24   attack, but the organization was among a group of people who

25   knew each other by name, who worked with each other, who had

1    grown up with each other at times, who had been introduced to

2    each other by friends, who partied with each other.

3         That is a very different kind of structure and a very

4    different kind of threat than one where it's simply a set of

5    associations that are between spirits, as it were, that could

6    be in any country that were moving information among several

7    countries using compromised basis in ether-space and relying on

8    attack techniques that does not require a physical presence.

9    So, it is moving into the incarnate world.

10        THE COURT:  All right.  I think I understand that.

11        MR. WEINBERG:  Thank you, your Honor.

12        First, if I can address what I think is reason one,

13   that the Government's reliance on the fact of 3147 as a statute

14   was not before Judge Saris.  But clearly the Government argued

15   strongly in their brief, page 2, he did so while on pretrial

16   release from an earlier federal case and while intentionally

17   obstructing justice.  They have a title on page 6, "Gonzalez

18   Disrespected the Courts and Intentionally Obstructed Justice."

19   There was a feature on page 7, when they talked about him lying

20   and manipulating the federal courts, federal law enforcement,

21   even his own family.  And Judge Saris, although I don't recall

22   her specifically addressing the "lied to the Court" clearly as

23   a part of her sentencing reasons, talked about this period of

24   deception, and it was one of the points that weighed against my

25   contention that a 15-year sentence was sufficient and that no

1    greater sentence was necessary.

2          Second, in terms of the evolution, Judge Saris's case

3    was saturated with international nexuses and relationships.

4    First, the servers, which are about the only thing or the

5    principal thing he did to facilitate Hacker 1 and Hacker 2 in

6    2007, was to provide them with access to servers in Estonia,

7    which were leased and which, with the server in the Ukraine,

8    were used to hold either the 40 million or 11 million credit

9    and debit cards that were at the heart of the case before Judge

10   Saris.

11         Second of all, the Dave & Buster's case, which is the

12   New York case, which was the second of the two cases before

13   Judge Saris, to my understanding was an internet, or remote or

14   not on-the-scenes hack.

15         Third, is that the Government's principal presentation

16   to Judge Saris -- and they even provided an exhibit of a chat

17   log that went on for perhaps over a hundred pages largely in

18   2006 between Mr. Gonzalez and a man named Maksym.  His

19   computers were first seized in Dubai.  He was then arrested

20   with his computers in Turkey.  He was a man who, I think, came

21   from Ukraine.  He was a person that the case in front of Judge

22   Saris reflected was the principal receiver of the fruits of

23   Mr. Gonzalez's computer intrusions in the ten retail stores, at

24   least one of which I believe, Forever21, was hacked into with

25   an SQL injection.

1          Fourth, the case before Judge Saris dealt with money

2     laundering, and the government made a particularized

3     presentation that Mr. Gonzalez had skills in moving money

4     through the internet, through e-gold, and, ultimately, the

5     couriers received money from foreign sources.  So that it is, I

6     think, not a fair compartmentalization of these two cases as

7     domestic, international, as wireless, SQL.

8          THE COURT:  Let me just stop at Maksym.  He is a named

9     defendant in -- is it the New York case?

10          MR. HEYMANN:  The Eastern District of New York case,

11     yes, your Honor, and also, perhaps, the case in San Diego.

12          THE COURT:  Is he a fugitive?

13          MR. HEYMANN:  He was.  As I understand it, he was

14     prosecuted in Turkey, received a -- the information on what

15     sentence he received has always been soft, but the reports were

16     30 years.  But I want to be clear that that information has

17     never been fully confirmed by the Government, and, therefore,

18     it's been soft.  But he was prosecuted there.  As a result, he

19     has not been extradited to the United States.  So, as a

20     technical matter, I don't know whether he's a fugitive, but he

21     hasn't been brought before the Courts in either the Southern

22     District of California or the Eastern District of New York.

23          THE COURT:  Okay.  And it lists him at page 3 of the

24     Presentence Report as the cases pending with respect to

25     Alexander Suvorov.  He was involved in the Judge Saris case,

1    right?

2         MR. HEYMANN:  He was involved in the Eastern District

3    of New York case.  He has pled guilty in the Eastern District

4    of New York.

5         THE COURT:  All right.

6         MR. HEYMANN:  And I want to say that Mr. Weinberg is

7    absolutely correct.  It was not, to the best of my knowledge, a

8    wireless attack on Dave & Buster's.

9         THE COURT:  Okay.

10         MR. WEINBERG:  The Government brief, again, strongly

11   put before both Judge Saris and yourself the chat logs with

12   Maksym dating to 2006, dealing with Maksym's receipts of cards.

13   That was in the Judge Saris case and talked about, indeed, as

14   early as 2006 Gonzalez urged his, quote, international payment

15   card fence, Maksym Yastremski, to quickly sell payment card

16   numbers.

17         In short, your Honor, this is not two

18   compartmentalized and different conspiracies with his somehow

19   being at the heart of a new and more sophisticated and more

20   international, a different conspiracy.  He was communicating

21   with Hacker 1 and/or 2 well before the end of the Judge Saris

22   case.  And what distinguishes this case, instead, is his

23   minimal involvement as contrasted to the ten, separate computer

24   intrusions that were at the heart of the case before Judge

25   Saris.

1          THE COURT:  And the recommendation is 15 years; is

2     that right?  Your recommendation is 15 years?

3          MR. WEINBERG:  Is 17 years, your Honor.

4          THE COURT:  17 years.  Adding -- with the consecutive

5     3147?

6          MR. WEINBERG:  Yes.  And in that recommendation I

7     would ask that the net result of the aggregate sentence be no

8     greater than 20.  And I would ask the Court, because of the

9     anomaly that he was arrested in the New York case in May of

10    '08, the Mass. case in September of '08, perhaps August, this

11    case not until September '09, there's 15 real months where he

12    was detained, where he's unlikely to get Bureau of Prison

13    credit.  And, therefore, I would ask the Court to consider, if

14    the Court determines that a 20-year sentence sends the message

15    which Judge Saris expressly stated she wanted to send in terms

16    of general deterrence and properly accommodates the positives

17    that she determined about Mr. Gonzalez, to consider a sentence,

18    the aggregate of which would result in a sentence 15 months

19    less than the 20-year concurrent.

20         I am concerned that the Bureau of Prisons will find

21    that his detention was on Mass. and New York and, therefore,

22    begin whatever sentence your Honor imposes and only give him

23    credit to the date of his arrest on the New Jersey case, which

24    was deep into '09.  I am not an authority on how they impose

25    credits.  I know they do it.  It's like the designations of

1        prisons.

2                THE COURT:  No; that I know.

3                Ms. Sinclair, do you know what is going to happen with

4        something like this?

5                PROBATION OFFICER SINCLAIR:  Your Honor, I am not

6        certain what will happen in this case.  It will depend on how

7        the Bureau of Prisons view this case.  Your Honor could

8        certainly make a recommendation that you view it to be related

9        to these other cases and that it should all be considered one

10       conduct and that you expect that the credit will be awarded as

11       time served, but I don't know how they are going to award it

12       individually.

13               THE COURT:  All right.

14               Does the Government have a view on this?

15               MR. HEYMANN:  I do not, no, your Honor.

16               THE COURT:  All right.  Well, I will hear from any

17       person who is a victim who wishes to be heard in open court.

18       Of course, I have received, in particular, two letters, one

19       from Heartland and one from a Hannaford customer.

20               Is there anyone else who wishes to be heard?

21                       (No response)

22               THE COURT:  And seeing none, then, Mr. Gonzalez, I

23       will hear from you.

24               THE DEFENDANT:  Thank you, sir -- your Honor, for

25       allowing me to address the Court today.

1          Your Honor, as you heard, I I am guilty of these

2    crimes which I stand before you today to be sentenced.  I am

3    not denying this.  I accept full responsibility for my actions,

4    and, as you know, I have exploited the relationship that I had

5    with an agency who, in my eyes, gave me a second chance at

6    life, and for this I will ever be sorry.  I have also violated

7    the sanctity of millions of individuals throughout the United

8    States and the sanctity of the home of my parents.

9          Your Honor, I plead for leniency so I may one day

10   prove to my parents that I love them just as much as me.  I

11   understand that the road to redemption is going to be long and

12   difficult for me, but I have tried my best to, at the very

13   least, pave that road.

14         Thank you.

15         THE COURT:  Thank you.  Well, as I said when I started

16   out, my view is that the sentence imposed by Judge Saris is a

17   reasonable one, and I have sought to try to understand whether

18   there are grounds to either go below it or go above it, given

19   the particulars of this case, and there have been argued that

20   there are grounds to do so.  I think they cancel each other

21   out.

22         This is a snapshot, as Mr. Heymann vividly expressed

23   it, and, as a consequence of which, the defendant has not

24   received an enhancement for the role in the offense.  By the

25   same token, the nature of the criminality caught in that

1    snapshot suggests a trajectory beyond what was before Judge

2    Saris, a greater sophistication, a greater use of international

3    contacts and international resources, and, consequently, a

4    greater threat.

5         But, together, I think, without saying that they

6    actually cancel each other out, my view is that I have got to

7    treat this as a whole, and that the fair way to treat it as a

8    whole is to impose a sentence of 18 years on the core violation

9    and two years on the 3147, essentially -- not essentially -- it

10   is to be concurrent with the sentence imposed by Judge Saris,

11   precisely concurrent.

12        And I will make a recommendation to the Bureau of

13   Prisons, but it is really more than a recommendation, it is a

14   legal determination, that these are related cases that are

15   necessarily the same, and, consequently, all of them should

16   receive the benefit, such benefit as it is, of time served by

17   the defendant up until this point.

18        I am obligated, I think, to explain my reasons,

19   because I am departing very substantially from what the

20   guideline would be in this case.  The guideline bears

21   emphasizing.  It is 35 years.  Apparently, the guideline was

22   even more significant before Judge Saris.  But what is clear is

23   that the Guidelines, with their kind of relentless algorithms,

24   do not capture in any nuanced way the nature of the offense

25   here.

1        So, I have recourse to Section 3553, which is the

2   larger set of principles for a sentence such as this.  First,

3   the seriousness of the offense and the nature of undermining

4   or, at least, affirming or not undermining respect for the law.

5   This is very sophisticated theft, but it is theft.  It is no

6   different than picking somebody's pocket in the larger calculus

7   of culpability.  It is simply that Mr. Gonzalez has

8   extraordinary gifts, and with those extraordinary gifts he has

9   decided to take, and he took a lot.  This is a kind of crime

10  that I am afraid we are more and more exposed to with the

11  proliferation of technology, which requires a severe sentence,

12  which this is, to emphasize the need for respect for the law

13  and not in any way to depreciate the seriousness of the

14  offense.

15       Now, I have in mind Mr. Gonzalez's own, personal life

16  history, and it has been plumbed at great depths, including

17  with two psychiatric reports, or psychosocial reports, perhaps,

18  is another way of saying it, and I think I am familiar with the

19  concepts involved.  My own view is that there is nothing in

20  that background which causes me to modify in any way the kind

21  of sentence that I would impose.

22       Ultimately, Mr. Gonzalez, I think you understand and

23  you recognize you are your own man; you are responsible.  And

24  displacing responsibility with therapeutic developments in the

25  psychiatric profession does not exculpate you at all.  The

1    Sentencing Guidelines, themselves, were meant to make sure that

2    if we are talking about diminished mental responsibility, that

3    it is something quite significant, and developments in perhaps

4    DSM-V do not do that; nor do substance abuse problems, which

5    you have had, which are real and which, apparently, you are

6    emerging from, relieve you of responsibility.  There is a

7    fundamental of individual responsibility here.

8         Now, I recognize that people with your gifts sometimes

9    find themselves obsessively dealing with the technology in a

10   way that is asocial and frequently becomes antisocial without

11   adequate consideration to who is being harmed and who can be

12   harmed.  I found quite compelling the letter from the elderly

13   couple who had their Hannaford information taken.  It is one

14   thing to say that they got their money back sooner or later

15   from some other institutions, but their lives were disrupted,

16   and in the way of anyone who is subject to the activities of a

17   thief in the night, they will forever be insecure.

18        So, these are matters of some very real consideration

19   captured by the concept of the seriousness of the offense and

20   not discounted by your circumstances.

21        I look to the question of general deterrence.  It is,

22   of course, very difficult to provide a specific figure for

23   general deterrence; there is no grid for it.  If there were, it

24   would be as inadequate as the Guidelines are for dealing with

25   this.

1        But this much we know:  That there is at large in the

2   community, maybe among younger people, a perception that there

3   is no harm if you do not see the people who end up being

4   affected by your technological prowess, that there are

5   different concepts of privacy.  It is, I suppose, the office of

6   someone less than fully adult not to be aware of the

7   consequences of their actions, but it is, consequently, very

8   important when persons with the skills and gifts that you have

9   receive, to the degree that there is a market for this kind of

10  information, the message that you are going to lose the middle

11  part of your life if you commit a crime like this.

12       You are in your mid-20s.  You will be in your mid-40s,

13  maybe early 40s, when you get out.  That is a tremendous loss,

14  and you will feel it, but it is in support of general

15  deterrence so that other people similarly situated to you will

16  understand what happens to them or what can happen to them.

17  And these sentences can only go up, and the Guidelines, as I

18  said, are higher than you have received.  You have received

19  very effective, I think, advocacy from Mr. Weinberg and his

20  colleagues and a degree of humanity, frankly, from Mr. Heymann

21  and his colleagues.  But this is real time, and it is meant to

22  deliver a message to others, and, perhaps, that is the

23  strongest aspect of this 3553 set of considerations.

24       With respect to individual deterrence, I am a bit

25  perplexed -- not perplexed -- But how long do we have to keep

1   you in jail?  That is what it is about.  Individual deterrence,

2   in a sense, is warehousing, to keep from you from doing this

3   crime again; warehousing and also impressing upon you the

4   seriousness of what you have done and that gets you habituated

5   to the idea that you should not do stuff like this.  Twenty

6   years is a long time for that.  I think the message has become

7   clear to you, and it will be internalized before the 20 years

8   is completed, but it is important to expose people to the idea

9   that other considerations, just deserts, seriousness of the

10  offense, questions of general deterrence, will trump or, at

11  least, modify and refine any sentence that also considers

12  specific deterrence.

13          I turn to the question of penological benefit, and,

14  here, it is a little difficult as well.  You are such a gifted

15  person.  You have skills that I think cannot fairly be

16  demonstrated in prison, and I share Judge Saris's view that

17  they should not be exercised for three years out during the

18  period of supervised release.  But it seems to me that it

19  becomes very important for you to take advantage of programs

20  within the prison system and, particularly, questions of

21  substance abuse.  Somebody who abuses substances the way that

22  you did or it is reported that you did does not need an AA

23  trainer or an NA trainer to tell you that every day you get up

24  in the morning you are an addict.  You have got to face that,

25  and the Bureau of Prisons has programs that will do that, and

1       you should take advantage of it.  And I will recommend the

2       500-hour program for drug treatment there.

3            Prisons are a peculiar place, as you, I am sure, know.

4       Nevertheless, it is possible to provide assistance to others.

5       I do not mean computer training, but I do mean that, with your

6       gifts, with your background, with your intelligence, that you

7       can be of assistance to other inmates.  And that may go to

8       something that is touched on by the psychiatrist but not a

9       reason for exculpation.  The kind of awkward social

10      interactions at various times in your life are really, as far

11      as I can see, narcissistic.  You have been focused on yourself

12      and your machine, and if you take advantage of the opportunity

13      to deal with people who have had much tougher lives than you

14      had who are in the prison system with you, then there will be

15      benefit from the prison experience for you.

16           I finally turn to the question of disparity among

17      sentences.  This is billed as the most serious of I guess what

18      we broadly call "hacking cases" to come to the Federal Court,

19      so there is no easy comparison.  But there are other

20      comparisons.  Mr. Weinberg made reference to some of them, with

21      some of the white-collar crime cases that just are, frankly,

22      all over the lot, and reflect, I think, a departure from the

23      core understanding of the Sentencing Reform Act in 1986, which

24      was to make white-collar crime on a par with, in parity with,

25      real crime, hard-core crime.

1       Judges who impose sentences tend to come from the same

2   general background or at least have some of the same

3   experiences and intellectual capacities and that sort of thing,

4   and, consequently, they look out at a defendant like you with

5   special gifts and are unlikely to impose as severe a penalty as

6   would be imposed on someone who committed a robbery involving

7   the same amount of money.  Of course, who would ever get to do

8   that?  It would take a number of Brinks robberies to capture

9   the amount of money that you captured through your

10  organization.

11      But it seems to me that, if we are dealing with theft,

12  which is what this is about, a sophisticated theft, then the

13  sentence has to be high, irrespective of whether, for various

14  reasons, other white-collar criminals have been able to obtain

15  less-severe sentences.

16      So, for that reason, to affirm one of the central

17  pillars of the Sentencing Reform Act that it should not be

18  class-biased when we come to sentencing, that this is an

19  appropriate sentence for you as well.

20      I will impose all of the conditions of supervised

21  release that Judge Saris imposed here.  I do not mean to have

22  any daylight between the sentence that is imposed here, except

23  as I have indicated, and that imposed by Judge Saris.

24      I will impose a $25,000 fine.  She did; I will.  The

25  question of restitution is something that the parties will, I

1    hope, get back to me -- I know you will get back to Judge Saris

2    -- with some manageable way of trying to deal with that.

3            There is a special assessment of $200 that must be

4    imposed.  I made clear -- I think I made clear -- but that the

5    sentence is 18 years.

6            MR. WEINBERG:  If your Honor please?

7            THE COURT:  Yes.

8            MR. WEINBERG:  And I apologize for interrupting, but

9    Probation has advised me and I think advised the Court in its

10   latest memo that their position is, and it is supported by some

11   case law, that any 3147 sentence, such as that which your Honor

12   is about to impose, will run after not only the 18-year part of

13   your Honor's sentence but the 20-year part of Judge Saris's

14   sentence.

15           So, I would ask the Court that, if the Court's intent

16   is that 20 years is sufficient but not greater than necessary

17   for Mr. Gonzalez, that your Honor consider putting more of the

18   sentence on the underlying core wire and 371 conspiracies and

19   reduce the part that's on the 3147, so that if Probation is

20   right, and if the cases are followed, and if that is how the

21   BOP computes his time, there would be, for instance, as

22   Probation said -- if there was one month or they even said one

23   day, the 20-year sentence plus one day would mean that it would

24   be 20 years plus one day.  But the way your Honor has currently

25   formulated it, we could run the risk of a 22-year sentence.

1          THE COURT:  Well, I understand the argument, I think.

2          Does the Government have a view about that?

3          I have to say, I found these cases more than passing

4     peculiar and not necessarily compelling, but there they are,

5     and so I have --

6          MR. HEYMANN:  I have got to confess, your Honor, I

7     found them counterintuitive.

8          THE COURT:  Yes.

9          MR. HEYMANN:  There is an opinion by Judge Cyr.  I

10    don't know whether that's been brought to the Court's

11    attention.

12         THE COURT:  Judge Cyr in the Eastern District of

13    Louisiana?

14         MR. HEYMANN:  In Maine.  That ruled to the contrary,

15    saying that, in his opinion, it was a --

16         THE COURT:  This is while he is sitting as a District

17    Judge?

18         MR. HEYMANN:  This is while he is sitting as a

19    District Judge.  If I may approach?

20         THE COURT:  Yes.

21         (Document handed to the Court through the Clerk)

22         THE COURT:  Well, let me put it in a different way.

23    What if I am wrong and Judge Cyr is wrong, and I am wrong, and

24    I impose this sentence?  You understand what I am trying to

25    achieve here?

1          MR. HEYMANN:  It is also the import of the plea

2     agreement between the parties as it says in -- does the Court

3     have it?  It's at the back there.

4          THE COURT:  I do.  Hold on a second.  Let me just get

5     it.

6          Go ahead.

7          MR. HEYMANN:  The import of paragraphs 4 and 5 are

8     that paragraphs 4 and 5 of the addendum are exactly what the

9     Court is trying to do and was the intent of the parties, that

10    the sentences run however -- whatever the Court sentenced, that

11    it run fully concurrent with the sentences imposed by Judge

12    Saris and in both the New York and Boston cases.

13         It puts me, as the representative of the Government,

14    in an awkward position.  It was the intent of the parties,

15    intent of the Government and the defendant in the New Jersey

16    agreement to do exactly what the Court is trying to do.  There

17    is a single District Court case from another District that says

18    it can be done, and three Appellate Court cases, all of which I

19    went back and read this morning --

20         THE COURT:  As did I.

21         MR. HEYMANN:  -- that say that that is not the way it

22    works.

23         THE COURT:  Can it be unraveled by 2255 or Rule 35 if

24    the Bureau of Prisons, because it is another branch of the

25    Government, decides otherwise?

1          MR. WEINBERG:  Unfortunately, I am concerned that it

2     might be a 2241 in the jurisdiction that Mr. Gonzalez is in,

3     and I would have difficulties bringing him back before the

4     Court.

5          THE COURT:  I think that the provident thing for me to

6     do, and I am not sure that it makes any difference, as a

7     practical matter, to --

8          MR. HEYMANN:  Your Honor --

9          THE COURT:  Let me just pause for a second.

10                         (Pause)

11         THE COURT:  If those Court of Appeals decisions are

12    right, the 3147 is on top of Judge Saris's cases, in any event,

13    is it not?

14         MR. HEYMANN:  That's correct, your Honor.

15         THE COURT:  If I imposed a sentence of two years, two

16    years on the substantive case and the 3147, then still the 3147

17    would mean that it is another two years.

18         MR. HEYMANN:  I think to deal with this in a wholly

19    practical matter --

20         THE COURT:  Right.

21         MR. HEYMANN:  -- that the Court has expressed its

22    intention, where the rule's different, that there be a clearer

23    sentence of two years' incarceration for the kind of conduct

24    which the defendant did, which is to commit additional and

25    egregious crimes while on release.

1          That having been said, as a practical matter, to

2     structure it in light of this odd situation that we're in with

3     three, separate cases in a way that imposed that two-year

4     sentence that way, runs the risk of, in fact, creating a

5     22-year sentence instead of a 20-year sentence.  And under

6     those circumstances, the provident thing to do to avoid

7     re-litigation in this District or another District is to simply

8     do the one day on 3147 and the remainder of the sentence on the

9     underlying offense conduct.

10          THE COURT:  Ms. Sinclair, does that work?

11          PROBATION OFFICER SINCLAIR:  I think that would work,

12     your Honor, to avoid any confusion.

13          THE COURT:  So, it becomes a sentence of 20 years and

14     a day?

15          PROBATION OFFICER SINCLAIR:  And just to be clear,

16     that the judgment will indicate that the one day is specific to

17     the 3147.  I think that would resolve the issue.

18          THE COURT:  Right.

19          MR. WEINBERG:  And I think it does work, your Honor,

20     and I would only ask -- maybe I'm getting greedy -- because of

21     the uncertainty about the credits, the 15 months, I would ask

22     the Court to reconsider a sentence of 18 years and 9 months, or

23     if that is something --

24          THE COURT:  I will not do that.  I appreciate the

25     practical solution that Mr. Heymann presented.  I want this

1    sentence to be 20 years and concurrent fully, and I will

2    reflect that in the judgment.

3              MR. WEINBERG:  Thank you, sir.

4              THE COURT:  And if it appears that the Bureau of

5    Prisons is not getting the instruction, I am sure that someone

6    will bring it to my attention here.

7              MR. WEINBERG:  Thank you, Judge.

8              THE COURT:  So, the sentence is 20 years on the

9    substantive count and one day on the 3147, to match Judge

10   Saris.

11             Now, are there other aspects of this that need to --

12             PROBATION OFFICER SINCLAIR:  Your Honor, just to be

13   clear, the judicial recommendations that you are imposing, you

14   have the 500-hour recommendation.  I believe there were a few

15   more in Judge Saris's case.

16             THE COURT:  I mean everything in Judge Saris's case

17   plus the 500 hours, if it is not in.

18             PROBATION OFFICER SINCLAIR:  It is.

19             THE COURT:  It is in?

20             PROBATION OFFICER SINCLAIR:  Yes, your Honor.

21             THE COURT:  Okay.  Then, as far as I am concerned, I

22   mean to match hers, unless somebody wants me to do something

23   different here or change it.  The Judgment and Commitment Order

24   has not been entered on the docket yet.

25             PROBATION OFFICER SINCLAIR:  No, it has not.

1              THE COURT:  So, I have not seen the form of it.

2              MR. HEYMANN:  It has not yet.

3              THE COURT:  Does anybody feel that they have not

4     clearly understood what the sentence is here, pronounced

5     orally?

6              MR. WEINBERG:  Thank you very much, your Honor.

7              THE COURT:  So, we will get that reflected as soon as

8     we can.  Thank you very much.

9              MR. WEINBERG:  Thank you, your Honor.

10             THE COURT:  Hold on just a second.

11                (The Court conferring with the Clerk)

12             THE COURT:  One final point, Mr. Gonzalez.  You should

13    understand you do have the right of appeal.  You will consider

14    whether or not it makes any sense under these circumstances in

15    consultation with your attorney.

16             We will be in recess.

17             THE CLERK:  All rise.

18             THE COURT:  Let me pass back Judge Cyr's decision.

19             MR. HEYMANN:  Thank you, your Honor.

20    (The Honorable Court exited the courtroom at 4:30 p.m.)

21    (WHEREUPON, the proceedings adjourned at 4:30 p.m.)

22

23

24

25

1                         C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Reporter

5    of the United States District Court, do hereby certify that the

6    foregoing transcript constitutes, to the best of my skill and

7    ability, a true and accurate transcription of my stenotype

8    notes taken in the matter of Unites States of America v. Albert

9    Gonzalez, No. 1:09-cr-10382-DPW-1.

10

11

12

13

14

15   Date:March 29, 2010          /s/ Brenda K. Hancock

16                                Brenda K. Hancock, RMR, CRR

17                                Official Court Reporter

18

19

20

21

22

23

24

25